MORGAN, LEWIS & BOCKIUS LLP
Andrew J. Gallo*
Stephan E. Hornung
Matthew C. Ziegler
Michael Morgan*
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
andrew.gallo@morganlewis.com
stephan.hornung@morganlewis.com
matthew.ziegler@morganlewis.com
michael.morgan@morganlewis.com

*application for admission forthcoming

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ING CAPITAL LLC,<br><br>                              Plaintiff,<br><br>                    v.<br><br>777 PARTNERS LLC, 600 PARTNERS LLC, SUTTONPARK CAPITAL LLC, SUTTONPARK SERVICING LLC, JOSH WANDER, STEVEN PASKO, and FREDERICK LOVE,<br><br>                              Defendants. | Civil Action No. _____<br><br>ECF Case<br><br>**Complaint** |

Plaintiff, ING Capital LLC ("ING Capital"), as and for its Complaint against Defendants, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners," and together with 777 Partners, the "777 Defendants"), SuttonPark Capital LLC ("SuttonPark Capital"), SuttonPark Servicing LLC ("SuttonPark Servicing," and together with SuttonPark Capital, the "SuttonPark Defendants"), Josh Wander ("Wander"), Steven Pasko ("Pasko"), and Frederick Love ("Love," and together with Wander and Pasko, the "Individual Defendants," and together with the

SuttonPark Defendants and the 777 Defendants, the "Defendants"), alleges as follows on information and belief:

## Nature of the Action

1.      This is an action to recover more than $28 million in loan proceeds that ING Capital advanced to an entity named Sierra 2016, LLC ("Sierra 2016"), based on a fraud Defendants perpetrated.  Sierra 2016 is the borrower under a credit agreement with ING Capital and is owned and controlled by Defendant SuttonPark Capital, an affiliate of the 777 Defendants.  Defendants induced ING Capital to make this loan in March 2022 via fraudulent representations that the loan proceeds would be used by Sierra 2016 to acquire a portfolio of 309 structured settlement receivables from Defendant SuttonPark Capital, which would in turn be used to repay the loan and provide security to ING Capital.

2.      Defendants had no intention of using the loan proceeds as they had represented.  At least 273 of the receivables purportedly to be acquired were not in fact owned by SuttonPark Capital and were never assigned to Sierra 2016, leaving ING Capital with a significant collateral shortfall.  The bulk of the loan proceeds were siphoned away by the 777 Defendants and used for other purposes, including purchasing receivables that Defendants or their affiliates pledged to other lenders.

3.      All of the Defendants were complicit in this fraud, and they conspired to conceal it from ING Capital for more than two years by issuing fraudulent monthly servicing reports and other documents representing that the receivables had been assigned to Sierra 2016, that Sierra 2016 had good title to these assets, and that ING Capital held a first-priority security interest in these assets and their proceeds—all as required under the applicable loan documents.

4.      ING Capital has just now begun learning the details of this longstanding fraudulent scheme.  ING Capital seeks to recover the loan proceeds it advanced in reliance on Defendants'

fraudulent misrepresentations, together with any other amounts it may determine it is owed with the benefit of discovery.

**Parties**

5.      Plaintiff, ING Capital, is a limited liability corporation organized under the laws of the State of Delaware.  ING Capital is wholly owned by ING Financial Holdings Corporation. ING Financial Holdings Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1133 Avenue of the Americas, New York, New York 10036.

6.      Defendant 777 Partners is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131.  Upon information and belief, 777 Partners has three members: SuttonPark Acquisition LLC (the majority member), 1221 Capital LLC and WBJP Partners LLC, each of which is organized under the laws of the State of Delaware and has its principal place of business in Florida.  Upon information and belief, SuttonPark Acquisition LLC has two members: JARM Capital LLC and MTCP LLC, both of which are organized under the laws of the State of Delaware and have their principal places of business located in Florida.  Upon information and belief, the sole member of JARM Capital LLC is Josh Wander and the sole member of MTCP LLC is Steven Pasko.  According to the Rule 7.1 Disclosure Statement 777 Partners filed in *Leadenhall Capital Partners LLP v. Wander*, No. 1:24-cv-03453 (S.D.N.Y.), ECF No. 120 (the "*Leadenhall* Action"), it is a citizen of Florida and Bermuda for purposes of diversity jurisdiction.

7.      Defendant 600 Partners is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131.  Upon information and belief, 600 Partners has three members: SPA II LLC (the majority member), 1221 Capital LLC and WBJP Partners LLC, each of which is

organized under the laws of the State of Delaware and has its principal place of business in Florida. Upon information and belief, SPA II LLC has two members, MTCP LLC and Steven Pasko. According to the Rule 7.1 Disclosure Statement 600 Partners filed in the *Leadenhall* Action, it is a citizen of Florida and Bermuda for purposes of diversity jurisdiction.

8.     Defendant SuttonPark Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131.  Upon information and belief, SuttonPark Capital has two members, 600 Partners and SPC Partners LLC, with 600 Partners owning 99.8% of SuttonPark Capital.  According to the Rule 7.1 Disclosure Statement SuttonPark Capital filed in the *Leadenhall* Action, it is a citizen of Florida and Bermuda for purposes of diversity jurisdiction.

9.     Defendant SuttonPark Servicing is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 600 Brickell Avenue, 19th Floor, Miami, Florida 33131.  SuttonPark Servicing is wholly owned by SuttonPark Capital. According to the Rule 7.1 Disclosure Statement SuttonPark Servicing filed in the *Leadenhall* Action, it is a citizen of Florida and Bermuda for purposes of diversity jurisdiction.

10.     Defendant Josh Wander is an individual and, upon information and belief, a resident of the State of Florida with a permanent address at 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.  Wander is a co-founder and Managing Partner of 777 Partners and 600 Partners, and upon information and belief, at all relevant times, he controlled and managed the entities acting as Originator, Servicer, and Borrower under the Transaction Documents (each as defined below).  Wander derives substantial revenue from interstate or international commerce based on his interests in the 777 Defendants and the SuttonPark Defendants, which, among other things, transact in structured settlement receivables in dozens of U.S. states and own professional sports teams in multiple countries.

11.     Defendant Steven Pasko is an individual and, upon information and belief, a resident of the State of Florida with a permanent address at 1451 Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131. Pasko is the other co-founder and Managing Partner of 777 Partners and 600 Partners, and upon information and belief, at all relevant times, he controlled and managed the entities acting as Originator, Servicer, and Borrower under the Transaction Documents (each as defined below). Wander derives substantial revenue from interstate or international commerce based on his interests in the 777 Defendants and the SuttonPark Defendants, which, among other things, transact in structured settlement receivables in dozens of U.S. states and own professional sports teams in multiple countries.

12.     Defendant Frederick Love is an individual, and upon information and belief, a resident of the State of Florida with a permanent address at 2680 Birch Terrace, Davie, Florida 33330. Upon information and belief, at all relevant times, Love was either an officer or an authorized signatory of each of the SuttonPark Defendants.

## Jurisdiction and Venue

13.     The Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000 and this action is between citizens of different states and citizens of foreign states are additional parties.

14.     The Court has personal jurisdiction over Defendants under N.Y. C.P.L.R. §§ 301 and 302 because (i) each of the Defendants consented to the non-exclusive jurisdiction of this Court in the Origination Agreement, the Servicing Agreement, and the Credit Agreement (each as defined below) or is otherwise bound by the forum selection clauses contained in those agreements, (ii) this case arises out of business transaction that took place within the State of New York, and/or (iii) each Defendant committed a tortious act without the state causing injury to person or property within the State of New York, and (x) regularly does or solicits business, or engages in any other

persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the State of New York, or (y) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

15.    Venue is proper under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the Southern District of New York and because the Defendants consented to venue in this district in the Transaction Documents.

<u>**Statement of the Case**</u>

**A.    The Transaction Documents**

16.    ING Capital, the SuttonPark Defendants, and Sierra 2016 (the "Borrower"), a wholly owned subsidiary of SuttonPark Capital, are parties to a lending structure under which ING Capital made loans to fund the acquisition of structured settlement receivables from third parties, which were then to be pledged to ING Capital as collateral.

17.    A structured settlement is a negotiated settlement of a claim that entitles the claimant to periodic payments over a defined time period, typically in settlement of a personal injury or other individual tort claim.  The rights to receive these payments can be bought and sold, allowing the claimant to exchange some or all of the future payment stream for an immediate lump sum of cash.

18.    On or about June 17, 2016, ING Capital, the Borrower and the SuttonPark Defendants entered into the following agreements:  (i) the Credit Agreement (defined below), under which ING Capital made loans to the Borrower; (ii) the Origination Agreement (defined below), under which SuttonPark Capital (the "Originator") was to sell receivables it had acquired from third parties to the Borrower to secure ING Capital's loans; and (iii) the Servicing Agreement

(defined below), under which SuttonPark Servicing (the "Servicer") was to administer ING Capital's collateral, including verifying the legitimacy of receivables SuttonPark Capital proposed to sell to the Borrower and collecting payments on these receivables after the Borrower obtained title to them.

### i. The Credit Agreement

19.     ING Capital, as Administrative Agent, Sole Lead Arranger and Sole Bookrunning Manager, entered into a Credit Agreement (the "Original Credit Agreement") with the Borrower, the Lenders party thereto from time to time (the "Lenders"), the Originator and the Servicer.

20.     On or about July 12, 2019, ING Capital, the Lenders, the Borrower, the Originator, and the Servicer entered into an Amended and Restated Credit Agreement (as amended, the "Credit Agreement").

21.     The parties to the Credit Agreement subsequently executed eight amendments to the Credit Agreement between March 12, 2020, and July 27, 2022.

22.     ING Capital, in addition to its role as Administrative Agent, Sole Lead Arranger and Sole Bookrunning Manager, is the sole Lender under the Credit Agreement.

23.     Pursuant to the Credit Agreement, ING Capital agreed to make a $50,000,000 credit facility (the "Credit Facility") available to the Borrower to fund the purchase of structured settlement payment rights ("Receivables") that met certain eligibility requirements (as defined in the Credit Agreement, "Eligible Receivables").

24.     As security for the Borrowers' Obligations under the Credit Agreement, pursuant to Section 2.17 of the Credit Agreement, the Borrower granted ING Capital a first-priority security interest in and lien on substantially all assets of the Borrower, including all Receivables that are acquired by the Borrower from time to time (collectively, the "ING Collateral").

25.     To perfect its security interest in the ING Collateral, including new Receivables acquired by the Borrower from time to time, beginning on June 17, 2016, ING Capital caused dozens of UCC-1 financing statements (including amendments and continuations) to be filed with the Delaware Secretary of State against the Borrower and the Originator.

26.     The Credit Agreement provides that a "Default" shall exist to the extent any representation of the Borrower, the Originator or the Servicer under any of the Transaction Documents is untrue or incorrect.  Credit Agreement §§ 1.01 ("Default"), 7.01(c).  After any such representation or warranty has been uncorrected for 30 days, an "Event of Default" is deemed to exist under the Credit Agreement.  *Id.* § 7.01(c).  Other Events of Default include (i) the existence of a "Servicer Default"—defined to include "any failure on the part of the Servicer duly to observe or perform" any of its obligations under the Servicing Agreement, *see* Servicing Agreement § 7.2(a), and (ii) a "Borrowing Base Deficiency"— defined as a condition in which the principal balance due under the Credit Facility exceeds the "Borrowing Base."  Credit Agreement § 7.01(h), (m).

27.     The Borrowing Base is equal, subject to certain adjustments, to 90% of the present value at any such time of all Eligible Receivables securing the Credit Facility.  Credit Agreement § 1.01 ("Borrowing Base").

## ii.  The Origination Agreement

28.     Contemporaneously with execution of the Original Credit Agreement, the Originator and the Borrower entered into an Origination Agreement (the "Origination Agreement"), dated as of June 17, 2016.

29.     Pursuant to the Origination Agreement, the Originator agreed to sell, transfer, assign or otherwise convey to the Borrower all of the Originator's right, title and interest in certain

Receivables and all Related Security (each as defined in the Origination Agreement) subject to and in accordance with the terms of the Origination Agreement.

30.    Pursuant to Section 2.05 of the Origination Agreement, ING Capital is named as an express third-party beneficiary with the right to enforce the Origination Agreement as if it were a party thereto.

### iii.  The Servicing Agreement

31.    Contemporaneously with the execution of the Credit Agreement and the Origination Agreement, ING Capital, in its capacity as Administrative Agent, the Borrower, and the Servicer entered into a Servicing Agreement (the "Servicing Agreement," and together with the Credit Agreement, the Origination Agreement, and all other documents or instruments executed connection with the Credit Facility, the "Transaction Documents"), dated as of June 17, 2016.

32.    Pursuant to the Servicing Agreement and a related intercreditor agreement, the Servicer is required to administer the ING Collateral securing the Credit Facility for the benefit of ING Capital.

33.    Together, the Transaction Documents provide a framework for the Originator's acquisition of Receivables from third parties, the Originator's sale of those Receivables to the Borrower, and the Servicer's ongoing administration of the Receivables and their proceeds.  As set out below, the Transaction Documents require the Originator and the Servicer to make representations regarding these Receivables to ING Capital both at the time of any acquisition of new Receivables and on a continuing basis thereafter.

34.    Defendants furnished each of the Transaction Documents to ING Capital representatives in New York, New York, for execution.  Representatives of ING Capital executed each of the Transaction Documents in New York, New York.

### B.    Loans Under the Transaction Documents

35.    Under the Credit Agreement, the Borrower may request Loans in the aggregate amount equal to the lower of (i) $50,000,000 (the "Commitment"), and (ii) the Borrowing Base calculated in accordance with the Credit Agreement.  Credit Agreement §§ 1.01 ("Borrowing Base Limitation"), 3.02(c).

36.    For a Receivable to be considered an "Eligible Receivable," the Borrower must, among other things, (i) have acquired the Receivable from the Originator pursuant to the Origination Agreement, (ii) "ha[ve] good and marketable title" to such Receivable, and (iii) "possess[] all right, title and interest in such Receivable and Related Security, Collections and proceeds thereof, free and clear of any Adverse Claim."  Credit Agreement § 1.01.[1]

37.    To request a Loan from ING Capital, the Borrower is required to submit to ING Capital a written Borrowing Request (in the form of Annex F to the Credit Agreement) signed by the Borrower and the Servicer, together with a pro forma Compliance Report (as defined in the Credit Agreement) signed by the Servicer as of the date of the Borrowing Request (in the form of Annex A-1 of the Credit Agreement).  Credit Agreement § 2.03, Annex A-1, Annex F.

### C.    Representations, Certifications and Warranties of the Borrower, the Servicer and the Originator

38.    In each Borrowing Request, each of the Borrower (which is owned and controlled by the Originator) and the Servicer certifies, among other things, that no Default or Event of Default (as defined in the Credit Agreement) has occurred and is continuing, that its respective representations and warranties in the Credit Agreement are true and correct, and that each Receivable that forms part of the stated Borrowing Base—both immediately before and after

---

[1] An "Adverse Claim" is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement (including any adverse claim referred to in Section 8-102(a)(1) of the UCC)."  Credit Agreement § 1.01.

giving effect to the proposed Borrowing—is an Eligible Receivable (meaning, among other things, that the Borrower has good and marketable title to each such Receivable and that no Adverse Claim exists).  Each Borrowing Request provides:

> The Borrower hereby certifies as of the date hereof that, immediately before and after giving effect to the Borrowing described above, (i) each of its representations and warranties in Article IV of the Credit Agreement shall be true and correct, (ii) no Event of Default or Default has occurred and is continuing, (iii) the Borrowing Base Limitation is not exceeded, no Borrowing Base Deficiency exists and each Receivable included in the calculation of the Borrowing Base satisfies the definition of "Eligible Receivable" in the Credit Agreement, (iv) no Reserve Account Deficiency exists and (v) all other applicable requirements of Section 3.02 of the Credit Agreement have been satisfied in all material respects with respect to the Borrowing contemplated hereby.

> The Servicer hereby certifies that (i) each applicable Transfer Order described in Section 3.02(f) of the Credit Agreement has been forwarded to the Back-Up Servicer, together with the related assignment agreement and, if any, the related stipulation (other than with respect to Unacknowledged Receivables) and (ii) as of the date hereof, immediately before and after giving effect to the Borrowing described above, each of its representations and warranties in Article IV of the Credit Agreement shall be true and correct.

Credit Agreement, Annex F.

39.    The pro forma Compliance Report calculates the Borrowing Base after giving effect to the requested Loan and contains a certification from the Servicer that, among other things, (i) all information in the Compliance Report is true and correct, (ii) no Default or Event of Default exists under the Credit Agreement, and (iii) the Borrower's representations and warranties in Article IV of the Credit Agreement are true and correct.  Credit Agreement § 2.03, Annex A-1.

40.     The representations and warranties contained in Article IV of the Credit Agreement include that:

* * *

(h)     The Borrower is the legal and beneficial owner of the Collateral free and clear of any Adverse Claim . . . . Each Receivable characterized in any Compliance Report or other written statement made by or on behalf of the Borrower as an Eligible Receivable, or as included in the Borrowing Base is, as of the date of such Compliance Report or other statement (or, if applicable, as of a date certain specified in such report), an Eligible Receivable, as properly included in the Borrowing Base;

* * *

(i)     Each Compliance Report . . . , Monthly Report . . . , information, exhibit, financial statement, document, book, record or report furnished or to be furnished at any time by or on behalf of the Borrower to the Administrative Agent or the Lenders in connection with and before or after the Effective Date is or will be accurate in all material respects as of its date or (except as otherwise disclosed to the Administrative Agent or the Lenders, as the case may be, at such time) as of the date so furnished (or, if applicable, as of a date certain specified in such report), and no such document (when taken together with such other documents so furnished) contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading; [and]

* * *

(n)     With respect to each Receivable and related Collateral, the Borrower shall have received such Receivable and related Collateral in an amount which constitutes fair consideration and reasonably equivalent value with respect to the purchase price paid by the Borrower.

Credit Agreement § 4.01(h), (i), & (n).

41.     Pursuant to Section 6.08 of the Credit Agreement, the Servicer represents and warrants as of the Effective Date, each Borrowing Date, each Calculation Date, each Distribution Date, each day on which a Disposition (each as defined in the Credit Agreement) occurs and each

other date provided under the Credit Agreement or the other Transaction Documents on which such representations and warranties are required or deemed to be made that:

* * *

> (b)    <u>Payment Instructions.</u>  Except for Receivables that constitute Third Party Intercreditor Receivables, it has notified (or has caused the Originator or the Borrower to notify) each Obligor on each Receivable to make payments on such Receivable to either one of the Lock-Boxes or one of the Deposit Accounts or to the Collection Account, as applicable; [and]

> (c)    <u>Compliance Reports and Monthly Reports</u>.  Each Compliance Report, Monthly Report or other pro forma written statement delivered by the Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.

Credit Agreement § 6.08(b) & (c).

42.    Contemporaneously with the delivery of the Borrowing Request and the Compliance Report, the Originator, the Borrower and the Servicer are required to prepare and deliver to ING Capital a "Servicing Notice," in the form attached as Exhibit B to the Servicing Agreement, certifying the *bona fides* of the Receivables to be acquired with the Loan proceeds. Origination Agreement § 2.02(a); Servicing Agreement § 1.1 ("Servicing Notice"); Servicing Agreement § 3.2.

43.    Pursuant to Section 4.01(g) of the Origination Agreement, the Originator represents to the Borrower and ING Capital that "[e]ach Receivable identified in any Servicing Notice shall be an Eligible Receivable as of the related Purchase Date." Origination Agreement § 4.01(g).  In other words, the Receivable in question must, once purchased by the Borrower, be a Receivable as to which the Borrower acquires "good and marketable title," among other things.  Credit Agreement § 1.01 ("Eligible Receivable").

44.     Before delivering the Servicing Notice to ING Capital, in its capacity as Administrative Agent, the Servicer is required to review and approve a "Receivable File" compiled by the Originator for each Receivable being purchased.  Origination Agreement § 2.02; Servicing Agreement §§ 3.2, 3.3.

45.     The Receivable File for each Receivable includes the relevant transfer documents pursuant to which the Originator acquired the Receivable, the settlement agreement memorializing the payment terms of the receivable (i.e., the agreement by which an insurer or other payor agreed to make payments in settlement of a litigation claim), any related Transfer Order[2] and any related judgments, a UCC lien search report against the seller of the receivable, and other evidence supporting the legitimacy of the receivable.  Credit Agreement, Annex D ("Receivable File Criteria").

46.     By executing the Servicing Notice, the Servicer certifies to ING Capital that the Servicer "ha[s] received the Receivable File for each Designated Receivable," determined that the "Servicing Eligibility Criteria for each Designated Receivable are satisfied,"[3] and will "administer each Designated Receivable and maintain each related Receivable File in accordance with the terms of the Servicing Agreement."  Servicing Agreement § 3.2, Exhibit B.

---

[2] "Transfer Order" shall mean a written order of a court of competent jurisdiction in any Approved Receivable State evidencing such court's approval of a transfer of some or all of a Receivable Seller's rights under a Contract to the Borrower, the Originator, the applicable Original Purchaser or the applicable Receivable Seller, which transfer has been made in accordance with such state's Transfer Statute, which order is binding with respect to such Receivable Seller (and its successors and assigns), the related Claimant (and its successors and assigns) and each of the Notice Parties, which order is not subject to (or the subject of) appeal, and has not otherwise been vacated or stayed.  Origination Agreement § 1.01 (definition of "Transfer Order").

[3] The Service Eligibility Criteria require that the Receivable File provided by the Originator be complete and match the list of Receivables included in the Servicing Notice.  Servicing Agreement Ex. A.

47.     If all Servicing Eligibility Criteria are satisfied, the Servicer is required to execute the Servicing Notice and return it to Originator, the Borrower, and ING Capital. *Id.* § 3.2.

48.     Once the Servicer receives the Receivable File, it is required to hold the Transfer Order and all other documents that make up the Receivable File in trust for the benefit of the Borrower and ING Capital. *Id.* § 3.3.

49.     Pursuant to Section 6.07 of the Credit Agreement, the Servicer agreed to indemnify ING Capital from and against all claims, losses, or liabilities (including reasonable attorneys' fees) related to or arising out of, among other things:

- any representation or warranty or statement made or deemed made by the Servicer (or any of its officers) under or in connection with [the Credit] Agreement or Compliance Report which shall have been incorrect in any material respect when made;

- any failure of the Servicer to perform its duties or obligations in accordance with the provisions of [the Credit] Agreement and the Servicing Agreement; [or]

- any breach of an obligation of the Servicer reducing or impairing the rights of the Administrative Agent or the Lenders with respect to any Receivable or the value of any Receivable.

*Id.* § 6.07(i), (iv), & (vi).

**D.      The Servicer's Obligations**

50.     Once an Eligible Receivable is transferred to the Borrower, the Servicer is required under the Servicing Agreement to "service, administer and collect amounts owing in respect of the Receivables in each case in such a manner that is in the best interests of and for the benefit of the Borrower, the Administrative Agent and the Lenders, all in accordance with applicable laws, rules and regulations," among other things.  Servicing Agreement §§ 1.1 ("Servicing Standard"), 2.1.

51.     Pursuant to Section 4.1 of the Servicing Agreement, the Servicer is required to prepare and deliver to ING Capital a "Monthly Report" that includes, among other things, a calculation of the Borrowing Base (i.e., the value of the Eligible Receivables securing the Loans),

all cash receipts received on account of each Receivable, the payment status of each Receivable, projected future cash receipts for each Receivable, and other financial metrics and data related to each Receivable included in the ING Collateral.  Servicing Agreement § 4.1; Credit Agreement, Annex A-2.

52.    Pursuant to Section 6.02 of the Credit Agreement, the Servicer is required, on behalf of the Borrower, to prepare all calculations required by the Credit Agreement and deliver Compliance Reports and Monthly Reports on each Calculation Date (each as defined in the Credit Agreement).  Credit Agreement § 6.02(e).

53.    Pursuant to Section 3.1(ix) of the Servicing Agreement, the Servicer is required to notify ING Capital upon the discovery of any "Defective Receivable," which is defined in the Origination Agreement to mean "any Purchased Receivable in respect of which any representation and warranty made by the Originator . . . is subsequently determined to have been incorrect in any material respect as of the related Purchase Date and such incorrectness has a Material Adverse Effect."  Servicing Agreement § 3.1(ix); Origination Agreement § 1.1 ("Defective Receivable").

E.    **Access to Information**

54.    The Credit Agreement and the Servicing Agreement each require the Servicer to provide information related to the Loans and the ING Collateral (including all Receivables) upon request.  For example, under Section 4.7 of the Credit Agreement, the Servicer is required to provide information during normal working hours to ING Capital upon five Business Days' written notice.  Section 4.7 of the Servicing Agreement provides:

> Section 4.7. <u>Access to Information</u>.  Upon giving at least five (5) Business Days' written notice, . . . the Servicer . . . shall give the Borrower, the Administrative Agent and their respective counsel, accountants, and other representatives reasonable access (including, without limitation, on-site access), during normal business hours, to all of its files, books and records (including computer records) relating to the Receivables or the Receivable Files and shall allow

the Borrower, the Administrative Agent and their representatives to discuss matters relating to the Receivables or the Services with its officers and employees.

Servicing Agreement § 4.7.

55.    Similarly, Section 5.02 of the Credit Agreement provides that each of the Borrower, the Servicer and the Originator must, at their expense, permit the Administrative Agent and its agents and representatives:

> (i) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of the Borrower, the Servicer or the Originator, as the case may be, including computer files (and the necessary hardware and software to access such computer files), (ii) to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer files, tapes and disks) in the possession or under the control of the Borrower, the Servicer or the Originator, as the case may be, relating to Receivables and Collateral, including, without limitation, the Receivable Files and Contracts, and (iii) to visit the offices and properties of the Borrower, the Servicer or the Originator, as the case may be, for the purpose of examining such materials described in clause (ii) above, and to discuss matters relating to Receivables and the Collateral or the Borrower's, the Servicer's or the Originator's performance under the Transaction Documents or under the Contracts with any of the officers or employees of the Borrower, the Servicer or the Originator, as the case may be, having knowledge of such matters[.]

Credit Agreement § 5.02.

56.    On May 29, 2024, ING Capital delivered a letter to the Servicer demanding that the Servicer turn over all records relating to the Receivables pursuant to section 5.02 of the Credit Agreement, among other things.  To date, the Servicer has not fully complied with this obligation.

**F.    The Defendants Fraudulently Induce ING Capital to Advance More than $28.2 Million to the Borrower**

57.    As of March 7, 2022, the outstanding principal balance of Loans under the Credit Agreement was $21,770,000, secured by an existing Borrowing Base of Eligible Receivables then valued in accordance with the Transaction Documents at approximately $21.8 million.

58.    On March 7, 2022, the Borrower and the Servicer submitted a Borrowing Request to ING Capital requesting a Loan in the principal amount of $28,230,000 (the "March 2022 Borrowing Request")[4] together with a pro forma Compliance Report (the "March 2022 Compliance Report") and a draft assignment agreement (the "March 2022 Assignment Agreement") purporting to identify 309 Eligible Receivables to be transferred to the Borrower and pledged to ING Capital to secure the requested Loan.[5]  As set out below, 273 of these purportedly Eligible Receivables were never transferred to the Borrower (the "Misrepresented Receivables").

59.    The March 2022 Borrowing Request and the March 2022 Compliance Report expressly included or incorporated by reference each of the representations required to be made by the Borrower (as controlled by the Originator), the Originator and the Servicer under the applicable Transaction Documents, including that, both before and after giving effect to the requested borrowing, "each Receivable included in the calculation of the Borrowing Base satisfies the definition of 'Eligible Receivable' in the Credit Agreement" and that the Borrowing Base, after giving effect to the acquisition of the Receivables, would equal $50,017,816.59.

60.    Defendant Pasko executed the March 2022 Borrowing Request on behalf of both the Borrower and the Servicer and the March 2022 Compliance Report on behalf of the Servicer.

61.    In reliance on the March 2022 Borrowing Request, the March 2022 Compliance Report and the other representations and warranties contained in the Transaction Documents, on March 7, 2022, ING Capital advanced $28,230,000 to the Borrower (the "March 2022 Loan Advance," and the proceeds thereof, the "March 2022 Loan Proceeds").

---

[4] $28,230,000 was the maximum amount that could be borrowed at that time under the Credit Agreement, bringing total principal outstanding to $50,000,000.

[5] The March 2022 Assignment Agreement was not in the form required by the Transaction Documents, but it nonetheless clearly identified a pool of purportedly Eligible Receivables to be transferred to the Borrower.

62.    Each of the certifications in the March 2022 Borrowing Request and the March 2022 Compliance Report was false when made because the Borrower never obtained title to the Misrepresented Receivables—i.e., the 273 Receivables that were identified in the March 2022 Compliance Report and the associated Servicing Notice but never transferred to the Borrower. Each such misrepresentation also constituted a Default, and, after 30 days, became an Event of Default under Section 7.01(c) of the Credit Agreement.

63.    The March 2022 Loan Proceeds were not used for their intended purpose of purchasing the Misrepresented Receivables to secure the Credit Facility.  Instead, the proceeds were transferred to one or both of the 777 Defendants or used to purchase receivables that were pledged to other lenders to the Defendants or their affiliates.

64.    As a result, the Credit Facility was left under-secured, and the Borrower was left without the means to repay ING Capital's loans.

**G.    The Servicer Submits Fraudulent Monthly Reports Falsely Representing to ING Capital that the Misrepresented Receivables Had Been Assigned to the Borrower and Pledged to ING Capital**

65.    The SuttonPark Defendants, with the assistance of the other Defendants, continued their fraudulent scheme after ING Capital made the March 2022 Loan Advance in order to hide the absence of the Misrepresented Receivables from the portfolio securing the Credit Facility. Each month the Servicer prepared and delivered to ING Capital a Monthly Report that materially misrepresented the calculation of the Borrowing Base by including the Misrepresented Receivables in the Borrowing Base, even though the Borrower had never obtained title to them.

66.    In each Monthly Report, the Servicer further certified that:

(i) the foregoing information is true and correct as of the dates specified above, (ii) no Default or Event of Default exists under the Amended and Restated Credit Agreement, dated as of Thursday, July 12th, 2019 (as amended, the "Credit Agreement"), by and among Sierra 2016, LLC, ING Capital LLC, as administrative agent

-19-

and lender, and SuttonPark Capital LLC, as originator and the undersigned, (iii) no Borrowing Base Deficiency or Reserve Account Deficiency exists, the Borrowing Base Limitation is not exceeded and each Receivable included in the calculation of the Borrowing Base satisfies the definition of "Eligible Receivable" in the Credit Agreement, (iv) the representations and warranties in Article IV of the Credit Agreement are true and correct.

67.     Defendant Pasko executed each Monthly Report on behalf of the Servicer.

68.     Each of the certifications contained in each Monthly Report and Compliance Report was knowingly false when made.  Because the Borrower had never acquired the Misrepresented Receivables, (i) the information provided in the Monthly Report was untrue as it indicated that the Misrepresented Receivables had been assigned to the Borrower and comprised a part of the Borrowing Base; (ii) multiple undisclosed Defaults and Events of Default existed under the Credit Agreement; (iii) a Borrowing Base Deficiency existed, and the Receivables included in the calculation of the Borrowing Base were not Eligible Receivables; and (iv) the representations and warranties in Article IV of the Credit Agreement were untrue.

69.     Each of these misrepresentations also constituted a further Default, and, after 30 days, became an Event of Default under Section 7.01(c) of the Credit Agreement.

**H.    The SuttonPark Defendants Reaffirm the Assignment of the Misrepresented Receivables via the 2022 Master Assignment Agreement**

70.     As noted above, the March 2022 Assignment Agreement did not conform to the requirements of the Transaction Documents.  To address this, in July 2022, at ING Capital's request, the SuttonPark Defendants executed a "Master Assignment Agreement" that purported to confirm and ratify all previous collateral assignments to the Borrower—including the purported assignment of the Misrepresented Receivables (the "2022 Master Assignment Agreement").

71.     In the 2022 Master Assignment Agreement, the Originator represented "that it has previously sold, assigned, transferred, and set over to [the Borrower] all of its right, title and

interest in and to the Receivables" set forth on an attached schedule, "in each case, as of the applicable date set forth on" the schedule.

72.     Defendant Love executed the 2022 Master Assignment Agreement on behalf of both the Originator and the Borrower.

73.     The schedule to the 2022 Master Assignment Agreement listed each of the 273 Misrepresented Receivables (using the same five-digit numeric codes) that were identified in connection with the March 2022 Borrowing Request and falsely represented that each such Receivable had been assigned to the Borrower as of March 7, 2022.

74.     The representations made in the 2022 Master Assignment Agreement were knowingly false when made because the Misrepresented Receivables were never assigned to the Borrower. Each such misrepresentation also constituted a Default, and, after 30 days, an Event of Default under Section 7.01(c) of the Credit Agreement.

**I.      Notices of Default, the Eighth Amendment to the Credit Agreement, and the Forbearance Agreement**

75.     The Credit Facility matured on July 12, 2022 (the "Maturity Date"), and all Obligations (as defined in the Credit Agreement) thereunder became due and payable. The Borrower failed to repay all outstanding Obligations by that date. This was an Event of Default under Section 7.01(b) of the Credit Agreement.

76.     By letter dated July 12, 2022, ING Capital notified the Borrower that an Event of Default had occurred and was continuing under the Credit Agreement as a result of the Borrower's failure to repay all amounts due and owing under the Credit Agreement on or before the Maturity Date.

77.     Subsequently, and in response to the default, ING Capital, the Borrower, the Servicer, and the Originator entered into the Eighth Amendment to the Credit Agreement (the

"Eighth Amendment"), dated as of July 27, 2022, which extended the Commitment Termination Date (as defined in the Credit Agreement), and by extension the Maturity Date, to August 30, 2022.

78.      In the Eighth Amendment, the Borrower (under the control of the Originator) represented, among other things, that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."   Eighth Amendment § 4.  The representations made in the Eighth Amendment were knowingly false when made because, among other things, the representations of the Borrower in the Transaction Documents were untrue and multiple undisclosed Defaults and Events of Default had occurred and were continuing as a result of, among other things, the SuttonPark Defendants' failure to acquire the Misrepresented Receivables and assign them to the Borrower.

79.      Defendant Pasko executed the Eighth Amendment on behalf of the Borrower, the Servicer and the Originator.

80.      The Borrower again failed to pay its outstanding obligations under the Credit Agreement on or before the extended August 30, 2022, Maturity Date.  This was an Event of Default under Section 7.01(b) of the Credit Agreement.

81.      By letter dated August 31, 2022, Plaintiff notified the Borrower that an Event of Default had occurred and was continuing as a result of the Borrower's failure to repay all amounts due and owing under the Credit Agreement on before the extended Maturity Date.

82.      At the SuttonPark Defendants' request, ING Capital, the Borrower, and the SuttonPark Defendants entered into a Forbearance Agreement (the "Forbearance Agreement"), dated as of August 30, 2022.

83. Pursuant to the Forbearance Agreement, Plaintiff agreed temporarily to forbear from exercising its rights and remedies under the Credit Agreement until the earlier of January 31, 2023, and the occurrence of a Forbearance Termination Event (as defined in the Forbearance Agreement).

84. Pursuant to Section 13 of the Forbearance Agreement, the Borrower ratified and affirmed that (i) all Receivables set forth on Schedule 1 to the Forbearance Agreement, which included the Misrepresented Receivables, had previously been assigned to the Borrower, and (ii) all Receivables set forth on Schedule 1 constituted Eligible Receivables under the Credit Agreement.

85. Defendant Pasko executed the Forbearance Agreement on behalf of the Borrower, the Servicer, and the Originator.

86. The ratifications contained in Section 13 of the Forbearance Agreement were knowingly false because the Misrepresented Receivables were never assigned to the Borrower and were not Eligible Receivables.

87. The Borrower failed to repay the amounts due under the Credit Agreement and the Forbearance Agreement on or before January 31, 2023, as required by Section 6(a) of the Forbearance Agreement.

88. By letter dated February 6, 2023, Plaintiff informed the Borrower that a Forbearance Termination Event had occurred under section 1(a) of the Forbearance Agreement as a result of the Borrower's failure to repay all Obligations and that, accordingly, the "Forbearance Period" under the Forbearance Agreement had terminated.

**J.    ING Capital's Investigation Regarding the Misrepresented Receivables**

89.    After the *Leadenhall* Action was commenced, ING Capital and its advisors began investigating the status of the ING Collateral.  On information and belief, including the foregoing investigation:

(a)    The Misrepresented Receivables were never acquired by the Originator or transferred to the Borrower.

(b)    No Receivable Files for the 273 Misrepresented Receivables exist.

(c)    Defendants Wander and Love have admitted to third parties that they were aware at the time of the March 2022 Loan Advance that the proceeds would not be, and were not, used by the Borrower to acquire the Misrepresented Receivables.

(d)    On March 7, 2022—the same day the March 2022 Loan Advance was made to the Borrower—the full $28.2 million of the March 2022 Loan Proceeds were transferred to SuttonPark Capital.

(e)    On March 7, 2022, SuttonPark Capital transferred approximately $20.1 million to a third-party aggregator of structured settlement receivables.  These funds were used to purchase receivables that were then pledged as collateral to lenders other than ING Capital.

(f)    The following day, March 8, 2022, SuttonPark Capital transferred $4.38 million to 777 Partners.

(g)    Eleven Receivables that *were* validly assigned to the Borrower as of March 7, 2022 (i.e., Receivables that were *not* included in the Misrepresented Receivables) have been used by the SuttonPark Defendants to pay another lender (the "Misdirected Receivables").

**K.    Defendants' Fraudulent Misrepresentations**

90.    ING Capital relied on each of the following misrepresentations, among others, in making the March 2022 Loan Advance and in forbearing from exercising remedies or taking other action to recover the March 2022 Loan Proceeds for more than two years thereafter:

(a)    The representations made by the Borrower (under the control of the Originator), the Servicer and Pasko (as signatory on behalf of the Borrower and the Servicer) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base Deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire

good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by the Servicer and Pasko (as signatory on behalf of the Servicer) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)    The representation made by the Originator under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to the Servicer shall be an Eligible Receivable.

(d)    The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)    The representations made by the Originator and Love (as signatory on behalf of the Originator) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)    The representations made by the Borrower (under the control of the Originator), the Originator, the Servicer and Pasko (as signatory on behalf of the Borrower, the Originator and the Servicer) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)    The continuing representations made by the Servicer and Pasko (as signatory on behalf of the Servicer) in each of the Monthly Reports the Servicer delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

## COUNT I
### (Breach of the Credit Agreement Against SuttonPark Servicing)

91.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

92.    The Credit Agreement is a valid and enforceable agreement.

93.    ING Capital fully performed its obligations under the Credit Agreement.

94.    All conditions precedent to enforcement of the Credit Agreement have been satisfied or waived.

95.    By executing and delivering the false March 2022 Borrowing Request, the March 2022 Compliance Report, and each Monthly Report thereafter, SuttonPark Servicing breached Sections 6.02 and 6.08 of the Credit Agreement.

96.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for breach of the Credit Agreement in an amount to be determined at trial.

## COUNT II
### (Breach of the Servicing Agreement Against SuttonPark Servicing)

97.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

98.    The Servicing Agreement is a valid and enforceable agreement.

99.    ING Capital fully performed its obligations under the Servicing Agreement.

100.    All conditions precedent to enforcement of the Servicing Agreement have been satisfied or waived.

101.    By making fraudulent misrepresentations regarding the Receivables to ING Capital and misusing the March 2022 Loan Proceeds to pay the 777 Defendants and purchase receivables that were pledged to other lenders, and by paying the proceeds of the Misdirected Receivables to

other lenders, SuttonPark Servicing breached Section 2.1 of the Servicing Agreement, which requires SuttonPark Servicing, among other things, "to service, administer and collect amounts owing in respect of the Receivables in each case in such a manner that is in the best interests of and for the benefit of the Borrower, the Administrative Agent and the Lenders, all in accordance with applicable laws, rules and regulations[.]"

102.    SuttonPark Servicing breached Section 3.1(ix) of the Servicing Agreement by failing to notify ING Capital of the existence of Defective Receivables from and after March 2022.

103.    SuttonPark Servicing breached Section 3.2 of the Servicing Agreement by failing to verify the legitimacy of purportedly Eligible Receivables to be acquired by the Borrower and by delivering the March 2022 Borrowing Request and the March 2022 Compliance Report which contained knowingly false certifications and representations.

104.    SuttonPark Servicing breached Section 4.1 of the Servicing Agreement by executing and delivering false Monthly Reports from March 2022 to the present.

105.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for compensatory damages in an amount to be determined at trial.

## COUNT III
**(Indemnification Under the Servicing Agreement Against SuttonPark Servicing)**

106.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

107.    Pursuant to Section 6.07 of the Credit Agreement, SuttonPark Servicing agreed to indemnify ING Capital, in its capacity as Administrative Agent and Lender, from and against all claims, losses, or liabilities (including reasonable attorneys' fees) related to or arising out of, among other things:

(a)    any representation or warranty or statement made or deemed made by SuttonPark Servicing (or any of its officers) under or in connection with the Credit Agreement or Compliance Report which shall have been incorrect in any material respect when made;

(b)    any failure of SuttonPark Servicing to perform its duties or obligations in accordance with the provisions of the Credit Agreement and the Servicing Agreement; and

(c)    any breach of an obligation of SuttonPark Servicing reducing or impairing the rights of the Administrative Agent or the Lenders with respect to any Receivable or the value of any Receivable.

108.    ING Capital has suffered losses as a result of SuttonPark Servicing's false representations and warranties contained in the Servicing Agreement and each Compliance Report and its failure to perform its obligations under the Credit Agreement and the Servicing Agreement.

109.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for all losses suffered as a result of SuttonPark Servicing's false representations and other breaches of the Servicing Agreement and the other Transaction Documents in an amount to be determined at trial.

## COUNT IV
### (Breach of the Origination Agreement Against SuttonPark Capital)

110.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

111.    The Origination Agreement is a valid and enforceable agreement.

112.    Pursuant to Section 2.05 of the Origination Agreement, ING Capital is an express third-party beneficiary of the Origination Agreement, entitled to the enforce the terms of the Origination Agreement as if it were a party thereto.

113.    All conditions precedent to enforcement of the Origination Agreement have been satisfied or waived.

114.    On or about March 7, 2022, ING Capital made the March 2022 Loan Advance to the Borrower in the amount of $28,230,000, which was supposed to be used to purchase the Misrepresented Receivables.

115.    Upon information and belief, in connection with the March 2022 Loan Advance, SuttonPark Capital, as Originator, delivered to the Borrower a Servicing Notice that falsely certified those matters specified in Section 3.01 of the Origination Agreement.

116.    Upon information and belief, after receiving the March 2022 Loan Advance from ING Capital, the Borrower remitted the purchase price to SuttonPark Capital for the Misrepresented Receivables.

117.    SuttonPark Capital never acquired title to the Misrepresented Receivables and never assigned or transferred title to the Misrepresented Receivables to the Borrower, in breach of the Origination Agreement.

118.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Capital for compensatory damages in an amount to be determined at trial.

## <u>COUNT V</u>
### (Fraud Against all Defendants)

119.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

120.    The 777 Defendants and Wander conspired and entered into an agreement with the SuttonPark Defendants, the Borrower (under the control of the Originator), Love and Pasko to defraud ING Capital and to fraudulently induce ING Capital to make the March 2022 Loan Advance and forbear thereafter from exercising remedies or taking other action to recover the March 2022 Loan Proceeds.

121.    The SuttonPark Defendants, the Borrower (under the control of the Originator), Love, and Pasko made material false written representations to ING Capital certifying the legitimacy and disposition of the Misrepresented Receivables and the Misdirected Receivables in connection with the March 2022 Borrowing request and thereafter, including:

(a)    The representations made by the Borrower (under the control of the SuttonPark Capital), SuttonPark Servicing and Pasko (as signatory on behalf of the Borrower and SuttonPark Servicing) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)    The representation made by SuttonPark Capital under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to SuttonPark Servicing shall be an Eligible Receivable.

(d)    The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)    The representations made by SuttonPark Capital and Love (as signatory on behalf of SuttonPark Capital) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Capital, SuttonPark Servicing and Pasko (as signatory on behalf of each of the foregoing entities) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)    The continuing representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in each of the Monthly Reports that SuttonPark Servicing delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

122.    Each of the Defendants knew that these representations (i) were false when they were made and (ii) would be relied upon by ING Capital in making the March 2022 Loan Advance to the Borrower and/or forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds thereafter.

123.    Each of the SuttonPark Defendants, Love and Pasko made (or caused the Borrower to make) the foregoing misrepresentations with the intent to defraud ING Capital.

124.    Each of the foregoing misrepresentations was made with the knowledge of 777 Partners, 600 Partners and Wander.

125.    Representatives of the 777 Defendants, including Wander and Pasko, continued to interact with ING Capital after March 2022 on a "business as usual" basis, offering additional investment products and communicating regularly with ING Capital employees, while knowingly concealing the existence of the frauds described herein.

126.    ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants, the Borrower (under the control of the Originator), Love and Pasko in making the March 2022 Loan Advance and in forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

127.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against all Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at trial.

### COUNT VI
### (Aiding and Abetting Fraud Against the
### Individual Defendants and the 777 Defendants)

128.    ING Capital repeats and realleges paragraphs 1 through 90 and 119 through 127 with the same force and effect as if set out in full.

129.    The SuttonPark Defendants, the Borrower (under the control of the Originator), Love and Pasko made material false written representations to ING Capital certifying the legitimacy and disposition of the Misrepresented Receivables and the Misdirected Receivables in connection with the March 2022 Borrowing request and thereafter, including:

(a)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Servicing and Pasko (as signatory on behalf of the Borrower and SuttonPark Servicing) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)    The representation made by SuttonPark Capital under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to SuttonPark Servicing shall be an Eligible Receivable.

(d)    The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction

Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)    The representations made by SuttonPark Capital and Love (as signatory on behalf of SuttonPark Capital) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Capital, SuttonPark Servicing and Pasko (as signatory on behalf of each of the foregoing entities) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement. Forbearance Agreement § 13, Schedule 1.

(g)    The continuing representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in each of the Monthly Reports that SuttonPark Servicing delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

130.    Each of the SuttonPark Defendants, Love and Pasko knew that these representations (i) were false when they were made and (ii) would be relied upon by ING Capital in making the March 2022 Loan Advance to the Borrower and/or forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds thereafter.

131.    Each of the SuttonPark Defendants, Love and Pasko made (or caused the Borrower to make) the foregoing misrepresentations with the intent to defraud ING Capital.

132.    ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants, the Borrower (under the control of SuttonPark Capital), Love and Pasko in making the March 2022 Loan Advance and in forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

133.    Each of the foregoing misrepresentations was made with the knowledge of the 777 Defendants and the Individual Defendants.

134.    The 777 Defendants and Wander each provided substantial assistance to the SuttonPark Defendants, Pasko and Love by, among other things, helping to conceal the fraud on an ongoing basis after the March 2022 Loan Advance.

135.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against the Individual Defendants and the 777 Defendants, jointly and severally, for compensatory and punitive damages in an amount to be determined at trial.

## COUNT VII
### (Unjust Enrichment Against SuttonPark Capital, 777 Partners, 600 Partners, Pasko and Wander)

136.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

137.    Upon information and belief, upon the Borrower's receipt of the March 2022 Loan Advance, SuttonPark Capital, the 777 Defendants, Pasko and Wander caused up to $4.3 million of the March 2022 Loan proceeds to be transferred to SuttonPark Capital and then onward to one or both of the 777 Defendants.

138.    In addition, SuttonPark Capital, the 777 Defendants, Pasko and Wander caused approximately $20 million of the March 2022 Loan Proceeds, as well as the proceeds of the Misdirected Receivables, to be used for the benefit of other lenders rather than ING Capital, which in turn benefited SuttonPark Capital, the 777 Defendants, Pasko and Wander.

139.    Pasko and Wander are the ultimate beneficial owners of the equity in the 777 Defendants.

140.    Each of SuttonPark Capital, the 777 Defendants, Pasko and Wander was enriched by the March 2022 Loan Proceeds and the proceeds of the Misdirected Receivables.

141.    The March 2022 Loan Advance and the misuse of the proceeds of the Misdirected Receivables were each at ING Capital's expense.

142.    It is against equity and good conscience to permit any of the Defendants to retain any of (or any of the benefit of) the March 2022 Loan Proceeds or the proceeds of the Misdirected Receivables.

143.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Capital, the 777 Defendants, Pasko and Wander, jointly and severally, for compensatory damages in an amount to be determined at trial.

## COUNT VIII
### (Failure to Provide Information Against SuttonPark Servicing)

144.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

145.    Section 5.02 of the Credit Agreement requires SuttonPark Servicing, among other things, to permit ING Capital "to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer files, tapes and disks) in the possession or under the control of the Borrower, [SuttonPark Servicing or SuttonPark Capital], as the case may be, relating to Receivables and Collateral, including, without limitation, the Receivable Files and Contracts[.]"

146.    Section 4.7 of the Servicing Agreement requires SuttonPark Servicing, among other things, to "give the Borrower, the Administrative Agent and their respective counsel, accountants, and other representatives reasonable access (including, without limitation, on-site access), during normal business hours, to all of its files, books and records (including computer records) relating to the Receivables or the Receivable Files."

147.    The information SuttonPark Servicing is required to make available under Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement includes information identifying the intermediate and ultimate disposition of the March 2022 Loan Advance proceeds.

148.    To date, despite numerous written requests, SuttonPark Servicing has not made all such information available to ING Capital, which has prevented ING Capital from completing its investigation with respect to the Misrepresented Receivables and other potential instances of fraud or wrongdoing.

149.    By reason of the foregoing, ING Capital is entitled to entry of an order compelling SuttonPark Servicing to provide all information requested by ING Capital pursuant to Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement.

<u>**COUNT IX**</u>
**(Intentional Fraudulent Transfer Against**
**SuttonPark Capital and the 777 Defendants)**

150.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

151.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital with an actual intent to hinder, delay or defraud ING Capital.

152.    On information and belief, SuttonPark Capital then transferred these proceeds to one or both of the 777 Defendants or to other entities owned and controlled by the 777 Defendants.

153.    ING Capital is, and was at the time of the relevant transfer, a creditor of the Borrower.

154.    The Borrower's transfer of the March 2022 Loan Proceeds to SuttonPark Capital is avoidable by ING Capital.

155.    The 777 Defendants and/or other entities owned and controlled by the 777 Defendants were immediate or mediate transferees of the March 2022 Loan Proceeds.

156.    By reason of the foregoing, ING Capital is entitled to (1) avoidance of the transfer of the March 2022 Loan Proceeds by the Borrower to SuttonPark Capital, and (2) judgment against SuttonPark Capital and the 777 Defendants for the value of the March 2022 Loan Proceeds, subject to adjustment as the equities require.

**COUNT X**
**(Constructive Fraudulent Transfer Against**
**SuttonPark Capital and the 777 Defendants)**

157.    ING Capital repeats and realleges paragraphs 1 through 90 with the same force and effect as if set out in full.

158.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital without receiving reasonably equivalent value in exchange.

159.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital at a time when the Borrower was insolvent.

160.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital at a time when it was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small.

161.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds at a time when it intended to or believed it would incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

162.    On information and belief, SuttonPark Capital then transferred these proceeds to one or both of the 777 Defendants or to other entities owned and controlled by the 777 Defendants.

163.    ING Capital is, and was at the time of the relevant transfer, a creditor of the Borrower.

164.    The Borrower's transfer of the March 2022 Loan Proceeds is avoidable by ING Capital.

165.    The 777 Defendants and/or other entities owned and controlled by the 777 Defendants were immediate or mediate transferees of the March 2022 Loan Proceeds.

166.    By reason of the foregoing, ING Capital is entitled to (1) avoidance of the transfer of the March 2022 Loan Proceeds by the Borrower to SuttonPark Capital, and (2) judgment against SuttonPark Capital and the 777 Defendants for the value of the March 2022 Loan Proceeds, subject to adjustment as the equities require.

### Prayer for Relief

**WHEREFORE**, ING Capital demands judgment against Defendants as follows:

(a)    Compensatory damages in an amount to be determined at trial;

(b)    Punitive damages in an amount to be determined at trial;

(c)    Costs and expenses, including reasonable attorneys' fees;

(d)    Entry of an order compelling SuttonPark Servicing to provide all information required to be provided pursuant to Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement;

(e)    Entry of an order avoiding the transfers of the March 2022 Loan Proceeds from the Borrower to the Originator, and from the Originator to the 777 Defendants; and

(f)    Such other relief as the Court deems just and proper.

Dated:  New York, New York
       October 17, 2024

Respectfully submitted,

*/s/ Stephan E. Hornung*
Andrew J. Gallo*
Stephan E. Hornung
Matthew C. Ziegler
Michael Morgan*
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
andrew.gallo@morganlewis.com
stephan.hornung@morganlewis.com
matthew.ziegler@morganlewis.com
michael.morgan@morganlewis.com

*application for admission forthcoming

*Counsel for Plaintiff ING Capital LLC*